UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| David DeCoff<br>c/o Cedar Glen Care & Rehabilitation<br>Danvers, MA<br><br>    Plaintiff<br><br>vs.<br><br>SMITHKLINE BEECHAM CORPORATION<br>d/b/a GLAXOSMITHKLINE,  and<br><br>GLAXOSMITHKLINE, LLC<br><br>Defendants. | Case No. 10-11978 GAO/MBB<br><br>Judge<br><br>Jury Demand Endorsed Hereon |

## COMPLAINT AND JURY DEMAND

Comes now the Plaintiff, David DeCoff, and brings this action individually, against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, and GlaxoSmithKline, LLC ("Defendants" or "GLAXO SMITH KLINE") and alleges as follows:

### STATEMENT OF PARTIES

1.  At all times relevant hereto, Plaintiff, David DeCoff, was a resident of Danvers, Massachusetts.

2.  Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline (GLAXO SMITH KLINE) is incorporated under the laws of Delaware and has its principal place of business in the United States at One Franklin Plaza, 200 N. 16th Street, Philadelphia,

Pennsylvania. GLAXO SMITH KLINE is the surviving entity from the following mergers: On May 7, 1995, GLAXO SMITH KLINE merged into Burroughs Wellcome Co. In connection with that merger, Burroughs Wellcome Co. changed its name to Glaxo Wellcome, Inc. On March 31, 2001, Glaxo Wellcome, Inc. merged with GLAXO SMITH KLINE. In November, 2009 SmithKline Beecham formed GlaxoSmithKline, LLC a Delaware corporation with its principal place of business located in Philadelphia Pennsylvania. As the surviving entity, GLAXO SMITH KLINE is liable for the actions and inactions of all the companies involved in the mergers. Defendants are engaged in manufacturing, marketing, promoting, selling and/or distributing the drugs Avandia, Avandamet and Avandaryl and regularly conduct business within the state of Massachusetts and within this district and derives substantial revenues from goods consumed in Massachusetts and within this district.

3.      At all times material to this lawsuit, the Defendants were engaged in the business of, or was successor in interest to, entities engaged in the business of researching, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising, distributing and/or selling the prescription drug product Avandia, Avandamet and Avandaryl (here in after referred to individually or collectively as "Avandia" or "Rosiglitazone") as an anti-diabetic medication to the general public, including Plaintiff and his physicians.

4.      At all times material to this lawsuit, the Defendants were authorized to do business within the state of Massachusetts and did in fact supply Avandia within the state of Massachusetts to Plaintiff and his physicians.

## JURISDICTION

5. Plaintiff alleges an amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. In addition, the Court has subject matter jurisdiction because it is an action between citizens of different states.

## FACTUAL ALLEGATIONS

8. GLAXO SMITH KLINE manufactures, promotes, distributes, labels, and markets a diabetes treatment prescription medication known as Rosiglitazone under the trade name(s) of Avandia® Tablets, Avandamet® Tablets, and Avandaryl® Tablets.

9. Rosiglitazone is in a class of drugs known as Thiazolidinediones (TZDs) or "Glitazones".

10. Avandia® was first approved for use in the United States in 1999 for the use in treatment of Type II diabetes mellitus, also known as non-insulin dependent diabetes mellitus ("NIDDM") or adult-onset diabetes.

11. In 2002, Avandamet®, a single pill combination of Avandia® and Metformin, was approved in the United States for use in treatment of Type II diabetes mellitus.

12. In 2005, Avandaryl®, a single pill combination of Avandia® and Amaryl®, likewise was approved in the United States for use in treatment of Type II diabetes mellitus.

13. Type II diabetes is the most common form of diabetes and occurs when the body fails to properly use insulin (insulin resistance), combined with relative insulin deficiency. Insulin, which is made in the pancreas, helps the body's cells use sugar from the bloodstream, which comes from foods and drinks. Sugar is a source of energy for cells. The third type, gestational diabetes, affects about 4% of all pregnant women - about 135,000 cases in the United States each year.

14. Most people with diabetes have health problems -- or risk factors -- that increase the risk for heart disease and myocardial infarction. More than 65% of people with diabetes die from heart disease or myocardial infarction. With diabetes, heart attacks occur earlier in life and often result in death.

15. Cardiovascular disease (CVD) is the main cause of death in these diabetic patients. Thus, it is important that anti-diabetic agents reduce, or at a minimum do not increase, the risk of cardiovascular disease, in a diabetic patient.

16. Numerous drugs are used for the treatment of Type II diabetes that, used in monotherapy or in combination therapy, are supposed to better control the disease in patients and reduce the health complications often associated with diabetes, such as heart attacks, myocardial infarctions and other cardiovascular complications.

17. Thiazolidinediones (TZDs) are a relatively new class of insulin-sensitizing anti-diabetic agents. Troglitazone (Rezulin) was the first TZD introduced in the United States in 1997 and was removed from the market in 2000 because of an association with significant hepatotoxicity.

18. In the United States, two TZDs are presently indicated for use in Type II diabetes

mellitus, Rosiglitazone (Avandia) and Pioglitazone (Actos). At all relevant times, Defendant was in the business of designing, licensing, promoting, manufacturing, marketing, selling and distributing pharmaceuticals and other products, including Rosiglitazone (Avandia).

19. Defendant is licensed to do business and in fact does business by agent in the state of Massachusetts. At all relevant times, GLAXO SMITH KLINE designed, developed, licensed, marketed, manufactured, sold and placed in the stream of commerce Avandia, including the Avandia at issue in this lawsuit. GLAXO SMITH KLINE did this throughout the United States, in the state of Massachusetts.

20. Plaintiff purchased and used Avandia, which had been prescribed for him by a physician licensed in the state of Massachusetts and he used it as prescribed.

21. Avandia was manufactured, sold, distributed and placed in the stream of commerce by the Defendant.

22. At the time Plaintiff began to use Avandia, he did not know, and could not have known, that Avandia was defective and could cause him injury.

23. Plaintiff did not know, and could not have known, that prior to the date he used Avandia, that the Defendant was aware and had knowledge that Avandia which it manufactured, marketed, sold and distributed was defective and had the propensity to cause severe injury including stroke and death.

24. Plaintiff's physicians did not know, and could not have known, that prior to the date he used Avandia, that the Defendants were aware and had knowledge that Avandia which it manufactured, marketed, sold and distributed was defective and had the

propensity to cause severe injury including stroke and death.

25. In fact, Defendants knew as early as 1999 that Avandia was unreasonably dangerous and could cause heart attacks, cardiovascular disease and deaths.

26. In 1999, Dr. John B. Buse (the current president-elect of the American Diabetes Association), a diabetes expert and head of endocrinology at the University of North Carolina, Chapel Hill, raised concerns about Avandia and heart problems, including the risk of heart attack and death.

27. Defendants attempted to silence Dr. Buse and further conceal the true nature of Avandia risks by threatening Dr. Buse with a $4 Million lawsuit and by characterizing him as a liar.

28. In response to Defendants' pressure, Dr. Buse sent a three-page letter to Dr. Tadataka Yamada, Defendants' Chairman of Research and Development. In the letter, Dr. Buse wrote, "I may disagree with GLAXO SMITH KLINE's interpretation of that data…I am not for sale … Please call off the dogs. I cannot remain civilized much longer under this kind of heat."

29. On March 15, 2000, John Buse, MD wrote a letter to the FDA again raising concerns about a, "worrisome trend in cardiovascular deaths and severe adverse events" associated with Avandia:

30. Dr. Buse was not the only person to alert Defendants to the increased risk of heart attack and death associated with Avandia. Shortly after Dr. Buse raised concerns related to increased risk of heart attacks associated with Avandia, Public Citizen filed a petition, on March 7, 2000, seeking immediate class labeling changes for all marketed TZDs6, including Rosiglitazone.

31. In an independent investigation of the TZDs, Public Citizen, after studying reviews by FDA Medical Officers, Statisticians, and Pharmacologists, transcripts of FDA advisory committee meetings, and scientific literature on Troglitazone, Rosiglitazone, and Pioglitazone, argued that information associating Rosiglitazone to heart attacks and serious cardiovascular injuries "was never included in the label, or seriously understated."

32. Public Citizen cited studies submitted to the FDA for approval that evidenced lack of efficacy and increase in cardiovascular risks, including but not limited to the increased risk of suffering a heart attack.

33. Public Citizen argued that nowhere in the product insert was there any mention of myocardial infarction even when the increased risk of myocardial infarctions was found in GLAXO SMITH KLINE's own studies.

34. Public Citizen pointed to several studies, many of which were studies conducted by GLAXO SMITH KLINE. The conclusion reached by Public Citizen was that Rosiglitazone was not as effective as alleged and the ingestion of Rosiglitazone increased the risk of myocardial infarction, death and other serious cardiovascular injuries8.

35. In addition to the concerns raised by Dr. Buse and Public Citizen, there have also been three meta-analyses conducted. Each meta-analysis has found that Avandia increases the risk of cardiovascular-related injury, including but not limited to myocardial infarction and death.

36. A meta-analysis combines the result of several studies that address a set of related research hypotheses.

37. The first analysis was performed by GLAXO SMITH KLINE and was handed over to the FDA in August of 2006. The meta-analysis consisted of 42 separate double-blinded, randomized, controlled clinical trials to assess the efficacy of Rosiglitazone for treatment of Type II diabetes compared to either placebo or other anti-diabetic therapies in patients with Type II diabetes. The combined studies included 8,604 patients on Rosiglitazone and 5,633 patients randomized to a variety of alternative therapeutic regimens, including placebo.

38. GLAXO SMITH KLINE's own meta-analysis found an overall incidence of myocardial ischemia in Rosiglitazone-treated subjects. The risk equated to more than a 30 percent excess risk of myocardial ischemic events in Rosiglitazone-treated patients.

39. A second meta-analysis conducted by Dr. Steven Nissen and Kathy Wolski titled Effect of Rosiglitazone on the Risk of Myocardial Infarction and Death from Cardiovascular Causes was published on May 21, 2007, in the New England Journal of Medicine (NEJM).

40. Nissen and Wolski reviewed data available to them through published literature, the FDA website, and GlaxoSmithKline's clinical-trials registry. The analysis included a review of 42 clinical trials involving nearly 28,000 patients.

41. Nissen and Wolski concluded that "[r]osiglitazone was associated with a significant increase in the risk of myocardial infarction and with an increase in the risk of death from cardiovascular causes that had borderline significance."

42. It was found that patients suffering from Type 2 diabetes mellitus have a higher risk of experiencing a heart attack within seven years than non-diabetic patients. The meta-analysis found that a diabetic taking Avandia has a much greater risk of suffering a

heart attack or serious cardiovascular event – an estimated 43 percent increase or greater – when compared with other diabetes drugs or placebos.

43. On July 30, 2007, the FDA presented its results of the internal FDA conducted meta-analysis. Similar to the GLAXO SMITH KLINE and Nissen/Wolski findings, the FDA likewise found an increase risk of heart attack, cardiovascular death, myocardial infarction and other serious ischemic related adverse events in patients on Avandia therapy and ultimately recommended that a boxed warning be placed on the Avandia label.

44. Thus, while GLAXO SMITH KLINE's Rosiglitazone containing drugs are marketed and sold by GLAXO SMITH KLINE as anti-diabetic agents that reduce a diabetic patient's risk of heart attacks, studies conducted by GLAXO SMITH KLINE showed that Rosiglitazone actually increases those risks by 43 percent according to the Nissen/Wolski meta-analysis and by 31 percent according to GLAXO SMITH KLINE's own meta-analysis.

45. Yet, even with this information available to it, GLAXO SMITH KLINE failed to warn consumers and the medical community about the increased risk of heart attacks and other serious cardiovascular injuries, including stroke, associated with Avandia.

46. Moreover, Defendant has repeatedly engaged in a pattern of conduct of deliberately avoiding FDA recommendations as to which issues relating to public hazards should be warned about.

47. For instance, after the FDA required GLAXO SMITH KLINE to change its label on February 8, 2001, to reflect a risk of heart failure observed in patients on Avandia and insulin, GLAXO SMITH KLINE defied FDA recommendations by engaging in false and

misleading promotional activities.

48.   In a letter dated February 22, 2001, the FDA's Division of Drug Marketing, Advertising and Communications (DDMAC) informed GLAXO SMITH KLINE that all promotional materials for Avandia should be revised to prominently include the new risks, no later than March 8, 2001.

49.   GLAXO SMITH KLINE responded on March 1, 2001, where in GLAXO SMITH KLINE committed to include the new risk information by March 8, 2001.

50.   However, instead of complying with FDA requirements GLAXO SMITH KLINE's sales representatives engaged in false or misleading promotional activities with respect to the new risk information in Avandia's product labeling.

51.   In a Warning Letter dated July 17, 2001, the FDA warned GLAXO SMITH KLINE that it had engaged in a continual violation of federal regulations in its promotional activities for the marketing of Avandia.

52.   In that July 17, 2001 letter, the FDA warned that the DDMAC had been monitoring its marketing of Avandia and had:

"[C]oncluded that GLAXO SMITH KLINE has promoted Avandia in violation of the Federal Food, Drug, and Cosmetic Act (Act) and its implementing regulations. See 21 U.S.C. §§ 331(a), (b), and 352(a), (n).   Specifically, during the 10th Annual American Association of Clinical Endocrinologists (AACE) Meeting in San Antonio, Texas, on May 2-6, 2001, representatives of GLAXO SMITH KLINE made oral representations denying the existence of serious new risks associated with Avandia at GLAXO SMITH KLINE's promotional exhibit booth. Additionally, GLAXO SMITH KLINE displayed Exhibit panels (AV013G) at the meeting that minimized these new

risks associated with Avandia.

53. Your promotional activities that minimize serious new risks are particularly troublesome because we have previously objected, in two untitled letters, to your dissemination of promotional material for Avandia that failed to present any risk information about Avandia or minimized the hepatic risk associated with Avandia. Despite your assurances that such violative promotion of Avandia had ceased, your violative promotion of Avandia has continued. "

54. Following the May 21, 2007 NEJM publication of the Nissen/Wolski meta-analysis, the FDA issued a safety alert for Avandia and advised patients who take it to consult their doctors.

55. On June 1, 2007, GLAXO SMITH KLINE published a "Dear Avandia Patient" letter, which responded to the "recent press coverage about the safety of Avandia." There in, GLAXO SMITH KLINE stated that it "stands firmly behind Avandia" and that "Avandia is the most widely studied medicine for Type II diabetes" and that the evaluation of clinical trials by "well-informed experts and researchers has been encouraging."

56. At the congressional hearing on June 6, 2007, the FDA indicated that a black box warning should be added to Rosiglitazone (Avandia), for increased risk of heart failure.

57. On July 30, 2007, the FDA held an Advisory Committee Hearing on the safety of Avandia. The panel was determining whether to recommend keeping the label the same, adding a black box warning, or taking Avandia off the market all together.

58. Dr. David Graham, testifying on behalf of the FDA, called for withdrawing Avandia and estimated that its toxic effects on the heart had caused up to 205,000 heart

attacks and myocardial infarctions, some fatal, from 1999 to 2006. For every month that Avandia is sold, Dr. Graham said, 1,600 to 2,200 patients will suffer more of those problems.

59. The FDA provided testimony that Avandia offers no unique benefits compared to other drugs in battling diabetes, but that all indications point to increased risks of heart attack and sudden death.

60. The panel of advisers to the Food and Drug Administration voted 20-to-3 that Avandia increases the risks of heart attacks.

61. The FDA convened a second advisory panel two years late on July 13 and 14, 2010 to consider the safety of Avandia.

62. Following those hearings a majority of the panel found that available data for Avandia found, among other things, that the drug significantly increased the risk of cardiovascular ischemic adverse events, like heart attack and stroke.

63. On September 23, 2010, the FDA significantly restricted access to Avandia because the benefits of Avandia therapy were outweighed by the risks of Avandia. Specifically, FDA found that data suggests an elevated risk of cardiovascular events, such as heart attack and stroke, in patients treated with Avandia.

64. Despite knowing of Avandia's defects prior to the date of Plaintiff's congestive heart failure due to the use of Avandia, the Defendants took inadequate steps to advise physicians, hospitals, nursing homes and other health care providers of the possibility of cardiovascular injuries like congestive heart failure.

65. Despite having actual notice of the dangerous propensities associated with

Avandia, prior to the date Plaintiff purchased and used Avandia, the Defendants took inadequate steps to advise consumers or medical providers, including Plaintiff of the known dangers of Avandia consumption, including but not limited to the increased risk of heart attacks, strokes and deaths. The Defendants failed to take adequate steps to ensure that the Avandia it manufactured was safe for the public and would function in the manner in which they were intending.

66. The Avandia ingested by Plaintiff was defective in that an ordinary prudent seller, being fully aware of the risks discussed above, would not have placed the product on the market and exposed Plaintiff to the risk of suffering congestive heart failure . As a result of using said Avandia, Plaintiff suffered congestive heart failure as a direct and proximate result of his ingestion of Avandia.

67. Even after being made aware of the numerous reports of cardiovascular adverse events, including those adverse events that occurred during GLAXO SMITH KLINE's own studies, Defendants still failed to take all reasonable and necessary steps to ensure that the consuming public, including Plaintiff, was aware of the increased risk of suffering a heart attack, stroke or death. As stated in the above, Defendants knew that Avandia caused cardiovascular injuries.

68. Plaintiff allege that GLAXO SMITH KLINE was aware of the dangerous propensity of Avandia referred to herein, that they knew the risks and dangers posed to those using Avandia, and Defendants acted with willful and wanton disregard for the safety of the consuming public, including Plaintiff.

69. Defendants widely promoted the use of Avandia as a safe and effective method of treating Type II diabetes mellitus.

70.  Due to the efforts of the Defendants, sales of Avandia rose to more than three billion ($3,246,555,709.76) dollars in 2006.

71.  GLAXO SMITH KLINE's net income (adjusted earnings) in 2006 was approximately $10.6 billion.

72.  As a result of Defendants' efforts and actions, the sales of Avandia have become an enormous source of profits for Defendants.

73.  Accordingly, the Defendants had a significant financial incentive to suppress, misrepresent and/or conceal any potential dangers or risks associated with Avandia.

74.  Plaintiff asserts that GLAXO SMITH KLINE acted for the purpose of maximizing profits at the expense of the health of Plaintiff, and the health of others using Avandia.  Plaintiff further assert that the Defendants had actual or constructive knowledge that Avandia posed a significant danger to anyone who used the drug, yet failed to take adequate or timely actions to prevent the injuries and deaths of users of Avandia or to warn the public of these dangers.

75.  GLAXO SMITH KLINE failed to adequately or appropriately disclose material information relating to the dangers associated with Avandia.  As a result, users and prescribers of Avandia, including Plaintiff and his physicians, were unaware of these dangers, did not have adequate information to know the warnings signs of being exposed to Avandia and were therefore unable to avoid injury caused by using this defective drug product.

76.  As a result of his stroke, Plaintiff incurred significant medical, hospital, rehabilitative and/or pharmaceutical expenses and/or other economic loss, loss of potential future earnings and/or net accumulations, and loss of consortium and support.

## First Claim for Relief - STRICT LIABILITY

77. Plaintiff hereby restate the allegations of paragraphs 1 through 76 set forth above.

78. Defendants were, at all relevant times, engaged in the business of designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing and placing in the stream of commerce Avandia.

79. Plaintiff purchased and/or otherwise properly acquired Avandia.

80. Avandia reached Plaintiff, the ultimate user and consumer of this product, without any substantial change in its condition from the time it was manufactured and/or sold by Defendants.

81. Avandia, when it reached Plaintiff, was in a defective condition and/or was in a condition that was unreasonably dangerous to the ultimate user or consumer. Said Avandia was dangerous to an extent beyond that which would be contemplated by the ordinary user or consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics.

82. Avandia was further defective in that an ordinary prudent seller, being fully aware of the risks described above would not have placed Avandia on the market.

83. Plaintiff used Avandia, as it was designed and intended to be used, and suffered congestive heart failure as a result. His injuries were the direct and proximate result of the product's defective and/or unreasonably dangerous condition.

84. As a direct and proximate result of Defendants' designing, creating, manufacturing, testing, labeling, packaging, supplying, marketing, selling, advertising,